RODEN COAL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7915.   Decided November 27, 1926.

Houses erected or acquired by a coal mining company for its employees, under the facts of this case, are facilities erected or acquired for the production of articles contributing to the prosecution of the war, and as such are subject to the amortization deduction.

*William S. Pritchard, Esq.,* for the petitioner.
*J. Arthur Adams, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income and profits taxes for 1918 in the amount of $30,773.33.

The petitioner admits a deficiency of $5,000, leaving the amount in controversy $25,773.33. The questions involved are:

(1) The amount of amortization deduction, if any, allowable in 1918.

(2) Whether the petitioner is entitled to deduct the cost of certain items of equipment and plant during the taxable year, or whether such items are properly chargeable to capital account.

(3) Whether the petitioner is entitled to a deduction on account of the exhaustion, wear and tear of assets used in its business in an amount greater than that allowed by the Commissioner.

FINDINGS OF FACT.

The petitioner is a corporation, which was organized under the laws of Alabama in 1907, having its principal place of business at Marvel. It was organized for the purpose of mining coal. Marvel is in a remote, rugged section of the Alabama coal fields, about forty miles south of Birmingham. There is no town or village within a radius of approximately ten miles, except certain camps of competitive mining companies. It was necessary for carpenters and laborers who were employed at the beginning of the mining operations to live in tents until houses could be erected.

The first coal was shipped from the mines during the fall of 1908. The following is a statement showing the production of the mine in tons for each of the years from 1908 through 1924:

| Year. | Tipple weights. Tons. | Year. | Tipple weights. Tons. |
|---|---|---|---|
| 1909 | 77,708 | 1917 | 216,668 |
| 1910 | 152,494 | 1918 | 238,131 |
| 1911 | 186,809 | 1919 | 163,334 |
| 1912 | 264,584 | 1920 | 92,889 |
| 1913 | 347,633 | 1921 | 91,643 |
| 1914 | 301,358 | 1922 | 135,194 |
| 1915 | 191,607 | 1923 | 168,018 |
| 1916 | 198,682 | 1924 | 138,919 |

The maximum production was reached in 1913.

In 1907 the petitioner's original plan provided for 100 tenant dwelling houses of the customary three and four-room type. Seventy of these houses were built and occupied by the petitioner's employees in 1908. The remaining 30 of the first 100 houses originally planned were completed and occupied during the latter part of 1909 and the first part of 1910. This group of 100 houses is designated as group 1.

Another group of houses, 97 in number, was built and occupied during the early part of 1913. The third group of houses, 60 in number, was purchased by the petitioner corporation during 1913 from the Alabama Fuel & Iron Co. for the sum of $10,000 in cash.

During the first part of 1918 large quantities of coal were ordered by the United States Government, through the United States Fuel Administration, to be furnished to the Southern Railway Co. and the Louisville & Nashville Railroad System. Also during that time further orders were placed with the petitioner, through the War Department, for coal to be furnished to the United States military cantonments and camps at Camp McClellan, Ala., Montgomery, Ala., Hattiesburg, Miss., the United States Naval Air Station at Pensacola, Fla., and other places, for the use of the Government.

From January 1, 1918, until the signing of the Armistice on November 11, 1918, from 75 to 85 per cent of the petitioner's entire output was furnished, either to the United States or to railroad and steamship companies, under orders of the United States Fuel Administration, or to corporations or individuals, in accordance with orders and directions from the United States Fuel Administration. This coal was sold by the ton and no coal was furnished to the Government or to any other purchaser on a cost-plus basis.

During 1918 most of the unmarried employees of the petitioner were called into military service. In order to produce the coal and furnish it to fill the orders and carry out directions of the United States Fuel Administration, it was necessary for the petitioner to employ married men. Buildings which had been erected by the petitioner as bachelor apartments became vacant. Married men refused to work for the petitioner in this remote section unless it would furnish tenant dwelling houses for their families. In order to meet the exigencies of the situation, the petitioner erected, between June 1 and November 11, 1918, 52 buildings of the four and six-room tenant dwelling house type, suitable to be occupied by families. The petitioner planned to erect 60 of such houses. On November 11, 1918, 52 of that number had been completed. Of those completed only 32 were occupied on November 11, 1918. The remaining 20 had not been occupied.

Upon the signing of the Armistice the United States canceled all contracts which it had placed with the petitioner for fuel. Immediately upon notice of such cancellation the petitioner stopped construction of the houses which had not been completed. Of the 20 houses which were never occupied, 19 were four-room houses which had cost the petitioner $896.43 each. One was a six-room house which had cost $1,200. The total cost to the petitioner of the said 20 houses which were never occupied was $18,232.17. This does not take into consideration any cost of the land upon which the houses were situated.

All of the said 20 houses which were never occupied were discarded and abandoned and have remained vacant at all times. They have, for all practical purposes, become demolished because of the fact that they were never occupied and received no care or attention whatever. The residual value of the houses is $50 each, or $1,000 for the 20 houses.

The total cost to the petitioner of the 52 houses which were built during 1918 was $44,400. Thirty-two of the 52 houses were occupied, although other houses which the petitioner had built became vacant because there was no need for such increased number over the ordinary post-war use of the petitioner. These 32 houses had cost the petitioner $26,167.83. Their estimated cost of reproduction under post-war conditions was $24,838.80. Approximately 100 houses of the petitioner have remained vacant since 1919.

During 1918 the petitioner acquired items of equipment and parts in accordance with the following statement:

| | |
|---|---:|
| Pipe Mine No. 3 | $3,134.78 |
| Waterworks | 1,016.49 |
| Steel sharpener and scale | 660.90 |
| Pumping plant | 1,522.00 |
| Mine cars | 3,110.00 |
| Rails and fasteners | 2,400.00 |
| Repairs, mine pumping plant | 878.16 |
| Repairs, hoisting and haulage | 1,466.98 |
| Repairs, electric air drills | 1,847.28 |
| Repairs, Mine Entry No. 3 | 1,730.65 |
| Total | 17,767.24 |

*Pipe Mine No. 3, $3,134.78.*—This item represents 6-inch pipe purchased by petitioner to be placed in its mine entry No. 3 to take the place of 4-inch pipe formerly in use. This pipe was used for the purpose of pumping water from the bottom of the mine to the surface for the purpose of keeping the mine dry. Mine entry No. 3 had reached its maximum production while the 4-inch pipe was in use and prior to the purchase of the 6-inch pipe. The 6-inch pipe was

made necessary by the increased depth of petitioner's workings and consequent increased volume of water. The 6-inch pipe did not increase the output of the mine, but was placed there for the purpose of maintaining the normal production.

*Waterworks, $1,016.49.*—This item represents pipe purchased for the purpose of conveying water from the petitioner's waterworks reservoir to the steam boilers at mine entry No. 3. The pipe-line in use was not large enough to supply sufficient water to afford adequate steam made necessary on account of the fact that the mine had become deeper and longer. The old pipe was 2-inch and the new pipe was 4-inch. The new pipe did not increase, and was not intended to increase, the normal output of the mine. The maximum development of the mine had been reached before the 4-inch pipe was put in.

*Steel sharpener and scale, $660.90.*—This represents a small tool used by the petitioner in its general machine shop for the purpose of sharpening drills. It took the place of a hand sharpener formerly in use for this purpose. The machine is about 9 inches wide and 18 inches long. It is mounted upon a tripod or pedestal which raises the machine a sufficient height from the floor for convenient operation. This item, like the two preceding items, was acquired by the petitioner after the mine had reached its maximum production.

*Pumping plant, $1,522.*—This item represents a pump used in mine entry No. 1 as pump No. 1. It is a replacement item. The original pump No. 1 was moved down to No. 2 and thereafter used as pump No. 2. Water in this entry is raised to the surface in five successive stages by five successive sets of pumps. The pump lifts the water up to the next pump, and as the mine goes deeper into the earth it is necessary to move them all down and put in new ones from time to time. Purchase of this pump was made necessary on account of the deepening of the mine. The normal production of the mine was not increased by this pump and the maximum production had been reached before it was put in.

*Mine cars, $3,110.*—This item does not represent mine cars but represents wheels for small one-ton mine cars. The wheels were required for repairing cars in use. They were to be used as repair parts only as it became necessary to replace wheels on cars from time to time.

*Rails and fasteners, $2,400.*—This item represents light weight second-hand rails purchased by the petitioner to be used under the ground in its slopes and headings.

*Repairs, mine pumping plant, $878.16.*—This item represents an electric motor purchased to drive pump No. 1 in entry No. 1 mentioned above. This electric motor was placed with and affixed to the pump 2,000 feet under ground.

*Repairs, hoisting and haulage, $1,466.98.*—This item represents a small hoist for handling one one-ton car at a time, used by the petitioner in developing the man-way.

*Repairs, electric air drills, $1,847.28.*—This item represents a small portable compressor that took the place of a compressor which had to be scrapped for lack of capacity to drive the petitioner's drills.

*Repairs, Mine Entry No. 3, $1,730.65.*—This item represents fittings used for the purpose of connecting two water-storage reservoirs under the ground.

All of the above items of equipment and parts had a life in excess of one year. The item under the head of "Mine cars," which represented wheels purchased to repair mine cars, represented a supply of wheels which the petitioner kept on hand. All of the items, however, were purchased after the petitioner corporation had reached its maximum development and did not increase the production.

OPINION.

TRAMMELL: The facts relating only to two issues are set out in the findings of fact. The petitioner, however, in its petition claimed that it was entitled to a deduction on account of the exhaustion, wear and tear of assets in excess of the deduction allowed by the Commissioner. Considerable testimony was introduced as to what the depreciation on certain assets allowed by the Commissioner was, but there is no evidence of record upon which we could find what is a reasonable deduction to be allowed the petitioner on account of the exhaustion, wear and tear of its assets, and for that reason we are unable to make a finding of fact upon that question. The determination of the Commissioner, therefore, with respect to the amount of depreciation, is approved.

On the question of the amortization deduction claimed by the petitioner, the question arises as to whether the petitioner acquired the buildings in question as facilities for the production of articles contributing to the prosecution of the war.

It is argued that the removal of coal from the ground is not the production of coal and that the petitioner did not produce articles contributing to the prosecution of the war. We believe, however, that the bringing of coal from the ground and making it fit for use by mining operations is the production of an article. While in the ground it is useless. Mining it and thereby making it commercially useful is, in the economic sense, production. This is also the common understanding of the meaning of the word when applied to natural resources.

The question then is whether coal furnished to railroads and others under the orders and directions of the United States Fuel Admin-

istration as well as coal furnished to manufacturers, may be said to have been an article which contributed to the prosecution of the war. From 75 to 85 per cent of the output of the petitioner's mine was furnished either to the Government for use in camps and cantonments, or to railroads or others under compulsion of an agency of the United States Government. It seems to us that it can not be questioned that coal furnished to the Government for the use of its Army camps and cantonments was an article which contributed to the prosecution of the war. We think also that coal furnished to railroads and steamship companies clearly contributed to the prosecution of the war. An adequate supply of coal, not only for such purposes but for private manufacturing concerns, was considered so important by the Government that the United States Fuel Administration was created for the purpose of supervising the distribution of coal and to make adequate provision for fuel to be supplied to industries in the United States and to railroads.

The amortization section does not provide that the articles produced must be absolutely necessary or essential to the prosecution of the war, but only that they contribute thereto. Efficient operation of the railroad systems and the carrying on of manufacturing operations, especially by those plants which the Fuel Administrator considered were entitled to receive coal, in our opinion, were instrumentalities which contributed to the prosecution of the war, and we believe that coal used for the purpose for which the petitioner's output was used was an article which contributed to the prosecution of the war.

The houses which the petitioner was required to build on account of war conditions, and the fact that it could not otherwise secure laborers or employees in order to produce the coal, are, in every substantial sense of the word, facilities acquired for the production of an article contributing to the prosecution of the war. The petitioner's mine was located in an isolated community. It had no labor supply upon which it could draw. It was necessary to bring in employees. Unmarried men who had been employed by the petitioner had gone to war and it was necessary to have married men carry on the work. Married men would not accept employment unless adequate housing facilities were provided.

These houses were built by the petitioner during 1918 at a cost of $44,400. Twenty of them were never used or occupied and were abandoned and became useless, except for such residual value as they may have had. The testimony is that the residual value of each house abandoned was $50. The cost of the houses was $896.42 each, except two, which had cost $1,200 each. One of the $1,200 houses was among those abandoned. This makes a total of 19 houses

at $896.42 each, and one at $1,200, which were abandoned. The residual value of these 20 houses was $1,000.

The deduction with respect to the houses erected in 1918 and entirely abandoned is the difference between their cost and their residual value.

The other 32 houses erected in 1918 were used and occupied, but by using them the petitioner abandoned an equal number of other houses which it would have used if it had not erected them, and in addition thereto the petitioner had other houses which were not used and were not useful in its post-war business. There was a surplus of at least one house for each one occupied. The usefulness of these houses in the business would thus be 50 per cent. In our opinion, a reasonable allowance on account of amortization with respect to these 32 houses should be determined by taking these facts into consideration.

With respect to these houses (which we have held to have been useful in the business to the extent of 50 per cent), in view of all the evidence in the case, in our opinion a reasonable allowance on account of amortization is $12,500.

The amortization deduction should be allowed in 1918. *Appeal of Walcott Lathe Co.* 2 B. T. A. 1231; *Appeal of John Polachek*, 3 B. T. A. 1051.

On the question of the deductibility as expense of the articles of equipment and parts which were purchased by the petitioner during 1918 which did not increase production and were not acquired for that purpose, we do not consider that the petitioner is entitled to the deduction claimed. The articles were capital items. *Appeal of Union Collieries Co.*, 3 B. T. A. 540; *Appeal of Kirk Coal Co.*, 3 B. T. A. 755.

*Judgment will be entered after 15 days' notice, under Rule 50.*